MULTIBESTOS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7598.      Promulgated April 26, 1927.

1. A loss deduction on account of abandonment, due to a change in business conditions, of a building in the use for which it was specially designed, and its devotion to a radically different use requiring costly alterations, allowed, in the year it was abandoned, the loss being measured by the difference between the depreciated value and the residual value.

2. An estimate by the officers of a corporation which abandons a building, as to the residual value of such building is entitled to considerable weight.

*Harvey H. Bundy, Esq.*, and *Abbot P. Mills, Esq.*, for the petitioner.

*J. E. Marshall, Esq.*, for the respondent.

This proceeding results from the Commissioner's determination of a deficiency in income and excess-profits taxes, for the year 1919, in the amount of $14,721.70, all of which is in controversy.

Error is alleged in the disallowance of loss deductions claimed on account of equipment sold and scrapped, and loss due to abandonment of one of the petitioner's buildings.

### FINDINGS OF FACT.

Petitioner was incorporated under the laws of Massachusetts, in 1911, with its principal offices at Worcester, Mass. It was first engaged in the manufacture of heavy cotton belting and cotton covering for fire hose. During 1914, the petitioner moved to a plant which it had built at Framingham, Mass., and engaged in the manufacture of asbestos clutch and brake lining. Subsequently, it also began the manufacture of friction or tire tape, rubberized cotton cloth and a rubber splicing compound. These latter articles were rubber specialities in the making of which reclaimed rubber was an ingredient. To effect economies in the making of its rubber specialties, petitioner needed a rubber-reclaiming mill. A plant, located at Walpole, Mass., owned by a rubber company which was in the hands of receivers, was on the market, and as the plant included a building especially built as a rubber-reclaiming mill, the petitioner purchased the plant in the fall of 1915, and moved its business there. Operations were begun in the purchased plant in January of 1916, and the Framingham plant was sold in the spring of 1916.

Following the move to Walpole, other rubber specialties, including rubber heels, rubber matting, and mechanical rubber, were added to the products theretofore manufactured. The making of rubber specialties had no relation to the asbestos clutch and brake lining features. The processes of manufacture were distinct and separate, and were carried on in separate buildings. The production of friction or tire tape represented about 90 per cent to 95 per cent of the rubber specialty output. During 1918 and 1919, the price of sheeting used in making the tire tape increased, first from 6 cents or 7 cents, to 10 cents, and then to 12 cents. Also, the price of crude rubber, theretofore very stable, was materially reduced. This change in market conditions caused petitioner to discontinue its rubber specialty business in 1919. The machinery used in that business was either sold or scrapped during that year, and the buildings used were in part, at least, utilized in the manufacture of the asbestos clutch and brake linings.

However, the rubber-reclaiming mill, having been especially built for the purpose it was intended to serve, was not adaptable to use in the production of asbestos brake and clutch linings. The mill was a five-story building, 35 by 55 feet inside measurements, the walls being of concrete, reinforced in part, and 2½ feet thick. In this building, there were 13 bins or tanks, through which the crude rubber was run at various stages of the reclaiming process. These tanks were enclosed in heavy concrete, and extended uninterrupted by floors, from above the fifth floor to within 4 or 5 feet of the ground floor. The dimensions of 8 of these tanks were about 3 by 5 feet, and 3 tanks were 8 by 10 feet. The tanks, together with the airways between, and the stairways, occupied about two-thirds of the floor space, with the exception of the ground floor, where they extended only part way to the floor. The machinery used in the rubber-reclaiming processes was of very heavy construction, and the walls of the buildings and of the tanks were designed to house and withstand the use of such machinery.

During the latter part of 1919, petitioner used this mill building only for the purpose of storing baled cotton. This use was negligible, as petitioner never purchased more than a carload of cotton at one time. Nor was the building suitable for storage purposes. The floor space was limited and only two floors at most were available for such storage purposes, as there were no elevators in the building. The building was centrally located with respect to other buildings of the plant, and there was no other space suitable for the erection of a centrally located plant unit needed to house part of the brake and clutch lining business, and to facilitate the passage of the product from one building to another at the various stages of manufacture. Under these circumstances, petitioner was faced with the necessity of demolishing the building and erecting a suitable one in its stead, or of reconstructing the old building to adapt it to fill the new requirements. During 1919, petitioner considered demolishing the building, but found that demolition could not be safely done by means of blasting, because of the proximity of the mill to other buildings. The only alternative of blasting was the electric drill, which was a slow and expensive means. Petitioner was advised by competent building engineers that the cost of demolition of the building would be prohibitive. The idea of razing the building was, accordingly, abandoned, and the building used incidentally for the storage of cotton during the remainder of 1919, as above indicated. Such machinery as could be removed from the building was sold or scrapped in the year 1919.

The depreciated cost of the building, as of the close of 1918, was stipulated to be $37,667.38. The officers and directors of petitioner knew the building could not be utilized in its brake and clutch lining business without expensive alterations. They considered the maxi-

mum residual value of the building to be $10,000 as of the close of 1919, which estimate conformed to an engineering estimate given, and it was marked down on the books to that value, and the remainder of the depreciated cost was claimed as a deductible loss sustained within the year.

Petitioner found the building to be a liability rather than an asset and found something. must be done with the same; accordingly, remodeling of the building was begun during the year 1920. It was impracticable to remove the concrete-enclosed tanks for the same reasons that it was impractical to demolish the building. The remodeling consisted largely of cutting through the concrete enclosures, extending the flooring inside the tanks, cutting windows through the walls, and making other alterations in preparation for the installing of machinery to be used, and to permit the materials to pass from one floor to another during the course of the processes to be carried on in that building. The remodeling was completed at a total cost of $35,404.03. Thereafter, the processes of preparing the raw cotton and asbestos, and the intermixing of those raw materials, were carried on in that building, from whence the mixture was passed on to other buildings, where the spinning and weaving took place. Some heavy machinery was used in crushing asbestos rock, but the rock was easily crushed, there being no vibration requiring unusual solidity in building construction. The remodeled building was not well adapted to the use to which it was put. The floor space was badly cut up and the various. processes were divided between five floors. They could have been carried on more economically had the building had fewer floors with more space to each floor.

It was stipulated at the hearing that the additional deductible loss sustained on the equipment sold or scrapped, is $3,982.81.

OPINION.

Milliken: In view of the above-mentioned stipulation, we need only consider the loss sustained on the rubber-reclaiming mill building during the taxable year. In support of the disallowance of this loss, the respondent cites article 143 of Regulations 45, which provides that a deduction may be taken on account of a loss in useful value of buildings "only when they are permanently abandoned or permanently devoted to a radically different use," and contends that the facts do not bring the petitioner within the prescribed test of deduction, to wit, a radically different use, as the building was continued in use in the manufacture of petitioner's standard line of products.

We are not persuaded by this contention, even if in point. We are of the opinion that the building was devoted to a radically dif-

ferent use. Summarizing, the facts show the building was constructed as a rubber-reclaiming building and that at least two-thirds of the space contained therein was occupied by concrete-enclosed tanks especially designed for and peculiar to the rubber-reclaiming processes; that expensive remodeling added only a comparatively small amount of badly cut up floor space to the remaining one-third of the original floor space which was in any sense adaptable to the new use, and that such remodeling was done only because the building could not have been safely and economically razed to provide space for the erection of a more suitable building. Petitioner decided, in 1920, to attempt to reconstruct the building, not because it thought that the same could be suitably or economically adapted to its asbestos brake and clutch lining business, but because the building was centrally located and it needed the site upon which to carry on its regular business. Petitioner could have constructed a building suitable in size and dimensions at a cost of not to exceed $32,000, whereas because of the impracticability of demolition of the old building, it spent over $35,000 and had an unsatisfactory building on its hands. We are unable to see the pertinency of respondent's suggestion that the use is not radically different, because petitioner used it to carry on the manufacture of its standard line of products, for the mill was designed to serve in the production of rubber specialities and that line of production was permanently abandoned. The record convinces us that there is little resemblance between the processes required to reclaim rubber and those incident to the preparation and mixing of cotton and asbestos raw materials.

The estimate made by petitioner's officers that the residual value of the building in question amounted to $10,000, was fixed somewhat arbitrarily, as representing the maximum value. Their judgment is strongly supported by testimony indicating that the building was a liability rather than an asset, as the cost of constructing a new and more suitable building would have been less during either 1919 or 1920 than the amount expended in remodeling the old building. We have heretofore held that the opinion of the corporate officers is entitled to considerable weight in estimates of this character, *Appeal of Dilling Cotton Mills*, 2 B. T. A. 127; *Kilby Car & Foundry Co. v. Commissioner*, 4 B. T. A. 1294. In view of the supporting testimony, we feel constrained to accept their estimate. The deficiency will be recomputed, allowing as a deductible loss the difference between the stipulated depreciated value of the building and $10,000, its residual value, and to accord with the stipulation with respect to the other deductions claimed.

*Judgment will be entered on 15 days' notice, under Rule 50.*